**In the Matter of the COMMISSIONER'S ORDER DENYING PERMIT APPLICATION 93–1024; Project No. 19 of the Red Lake Watershed District (Maple Lake Dam, Judicial Ditch # 73, Mitchell Lake Dam, Badger Lake Dam, Poplar River Diversion Dam, Tamarack Lake Dam, Polk Impoundment, and Poplar River Dam), Polk County.**

No. C1–94–1944.

Court of Appeals of Minnesota.

Feb. 7, 1995.

Review Denied April 27, 1995.

Robert G. Hensley, Mark J. Hanson, Doherty, Rumble & Butler, St. Paul, for Red Lake Watershed Dist.

Hubert H. Humphrey, III, Atty. Gen., Donald A. Kannas, Asst. Atty. Gen., St. Paul, for Minn. Dept. of Natural Resources.

Considered and decided by PARKER, P.J., and NORTON and SCHUMACHER, JJ.

## OPINION

PARKER, Judge.

The Watershed District challenges the order of the Commissioner of the Department Natural Resources summarily dismissing the district's application for a permit to work in public waters. We affirm.

## FACTS

The district court approved establishment of the Red Lake Watershed District ("RLWD"), relator, in 1969. Recently, RLWD devised the "Maple Lake Project" to augment lake levels in Maple Lake and to bolster flood-control measures in the area near the lake. Construction of the project would involve building a dike on state-owned land, and the ultimate impact would include occasional flooding of substantial portions of the Polk Wildlife Management Area. The Department of Natural Resources ("DNR") manages the affected state land and opposes any use of state land for this project.

RLWD commissioned an engineering report on the project and appointed three residents as appraisers of the project's costs and benefits, pursuant to state law. The RLWD's Board of Managers then held public hearings, found the benefits outweighed the costs, and approved the project. However, RLWD made no effort to condemn or otherwise acquire rights in the state land targeted by the project. Instead, RLWD next applied to the DNR for a permit to work in public waters in order to begin construction of the project.

The DNR rejected RLWD's permit application. Following RLWD's request for a contested case hearing, the DNR moved for summary disposition and formal denial of RLWD's permit request. The DNR relied, in part, on Minn.R. 6115.0240, subpt. 2.A, which requires applicants to describe their rights in, or ability to acquire rights in, land integral to a project. The administrative law judge recommended summary disposition, and the Commissioner of Natural Resources summarily denied RLWD's permit request. The Commissioner based his conclusion, as did the ALJ, on RLWD's inability to show that it could acquire property rights neces-

sary to construct the Maple Lake Project. RLWD appeals from the Commissioner's order.

## ISSUES

I. Can RLWD condemn the state land needed for the Maple Lake Project?

II. Did the Commissioner err by granting summary disposition?

III. Did the Commissioner's order constitute an impermissible appeal of RLWD's decision to approve the project?

## DISCUSSION

### I.

RLWD contends the Commissioner erred, because RLWD has the authority to acquire the necessary property rights from the state by eminent domain. Under Minnesota law, the state retains general authority over water management policy. *See, e.g.,* Minn.Stat. § 103A.201, subd. 1 (1994). However, watershed districts possess broad powers to develop local water policy plans and to undertake projects pertaining to flood control, lake levels, and other aspects of water management. *See id.* §§ 103D.201–.821. State law also grants "drainage authorities" substantial power to regulate "drainage" on a local level. *See id.* §§ 103E.005–.745. Chapter 103D delineates powers and procedures pertaining to watershed districts generally, while chapter 103E lays out supplemental powers and procedures applicable to drainage authorities constructing drainage projects. RLWD's challenge involves interpretation of these statutes and triggers *de novo* review. *See Arvig Tel. Co. v. Northwestern Bell Tel. Co.,* 270 N.W.2d 111, 114 (Minn.1978).

■ Specifically, RLWD argues that Minn.Stat. §§ 103D.715, subdivision 4, and 103E.025 provide it with authority to take or damage state land for this project, over the DNR's objection. We conclude that RLWD misconstrues these statutes. RLWD correctly asserts that section 103E.025, subdivision 2, gives drainage authorities a powerful

tool to take state land for drainage projects.[1] However, chapter 103E, titled "Drainage," applies only to drainage projects.[2] *See id.* §§ 103E.005, 103E.011. Although subdivision 4 of section 103D.715 refers to parts of 103E, including 103E.025, it concludes the reference with the phrase, "as they are applicable." *Id.* § 103D.715, subd. 4. Because chapter 103E covers drainage, section 103D.715 implicitly refers only *drainage projects* forward to chapter 103E. Other sections of chapter 103D similarly refer drainage projects to chapter 103E. *See id.* §§ 103D.601, subd. 1(b); 103D.621; 103D.625.

Closer examination of chapter 103E reveals the following: Section 103E.005 defines "drainage authority," "drainage project," and "drainage system."[3] *Id.* § 103E.005, subd. 9, subd. 11, subd. 12. Then, section 103E.011 delineates "drainage authority powers." This section includes a requirement that drainage authorities obtain permission from the Commissioner of Natural Resources to perform work that would affect public waters. *Id.* § 103E.011, subd. 3. Finally, section 103E.011 grants drainage authorities limited power to manipulate lake levels and build structures affecting *non-public* waters. *Id.* § 103E.011, subd. 4. Nothing in chapter 103E displaces the DNR's preeminent authority over non-drainage projects affecting public waters.

Outside the discrete realm of drainage projects, watershed districts must look to chapter 103D ("Watershed Districts") to discern their powers and applicable procedures. *See id.* §§ 103D.201; 103D.335, subd. 11 (enunciation of general eminent domain power); 103D.511 (specific exclusion of section

117.155 implies that chapter 117 generally applies to condemnations under chapter 103D). Chapter 103D lacks the expedited procedures and enhanced powers of chapter 103E. Under the general provisions, watershed district projects comprise three stages: board hearings, appraisers' report, and condemnation of property, if necessary. *Robertson v. Belle Creek Watershed Dist.*, 255 N.W.2d 236, 240 (Minn.1977) (watershed district wanted to build flood-control project). The instant appeal does not address the first two stages.

 Condemnation becomes necessary when a landowner refuses to convey land sought by a watershed district or other public entity. *See id.* Chapter 117 governs condemnation procedure generally. *Id.;* Minn.Stat. § 117.011. In reviewing condemnation powers, the Minnesota Supreme Court observed that not all condemnors enjoy equal powers of eminent domain. *State v. Christopher,* 284 Minn. 233, 238, 170 N.W.2d 95, 99 (1969). A hierarchy of entities exists, with the state at the top because of its sovereign authority. *Id.* · Furthermore, condemnation of public property for use inconsistent with its established public use requires specific statutory authorization. *City of Shakopee v. Minnesota Valley Elec. Co-op.*, 303 N.W.2d 58, 60 (Minn.1981).

RLWD has not characterized its Maple Lake Project as a drainage project; its brief states the purpose of the project as "to improve the supply of water to Maple Lake and to provide flood control." Thus, RLWD mistakenly directs us to chapter 103E as the source of its eminent domain power for this project. Application of chapter 103E to a

---

**1.** Minnesota's eminent domain law provides a parallel exemption for "drainage" from the standard eminent domain procedure. Minn.Stat. § 117.011 (1994).

**2.** The legislative findings encoded in section 103D.621, subdivision 1, explain the purpose of this statutory scheme:

> [B]ecause of urban growth and development in the metropolitan area problems arise for the improvement and repair of drainage systems which were originally established for the benefit of land used for agriculture. The procedure for improvement and repair of drainage sys-

tems now in the metropolitan area should be simplified to more adequately and economically improve and repair drainage systems.

Minn.Stat. § 103D.621, subd. 1.

**3.** " 'Drainage project' means a new drainage system, an improvement of a drainage system, an improvement of an outlet, or a lateral." Minn. Stat. § 103E.005, subd. 11. " 'Drainage system' means a system of ditch or tile, or both, to drain property * * * [including] the improvement of a natural waterway used in the construction of a drainage system and any part of a flood control plan * * * in the drainage system." *Id.* § 103E.005, subd. 12.

project unrelated to, or only tangentially related to, drainage would impermissibly expand the powers of watershed districts. Instead, we must look to the authority granted by chapter 103D in reviewing the Commissioner's decision.

 RLWD may not take the necessary land from the state for this project under the general condemnation provisions associated with chapter 103D. The DNR represents the state in declaring that it opposes use of state land for this project, and the state predominates over a watershed district in the eminent domain hierarchy. *See Christopher*, 284 Minn. at 238–39, 170 N.W.2d at 99. Thus, RLWD lacks the power to condemn this land over the DNR's objection. In addition, the project would put the land to a use inconsistent with its current use as part of the Polk Wildlife Management Area. Under the circumstances, the state's preeminence over this particular land seems beyond doubt. Only specific legislative authorization may overcome the state's preeminence in determining the ultimate use of this land. *See Shakopee*, 303 N.W.2d at 60. No such legislative authorization exists. Therefore, the RLWD cannot condemn this land.

## II.

 RLWD asserts that the Commissioner erred by summarily denying its permit request. We review summary dispositions to determine whether any genuine issue of material fact exists and whether the adjudicator applied the law correctly. *In re Leisure Hills Health Care Ctr.*, 518 N.W.2d 71, 75 (Minn.App.1994), *pet. for rev. denied* (Minn. Sept. 16, 1994). No factual issues exist here. Most importantly, neither side disputes that the Maple Lake Project targets state land, or that the DNR opposes use of state land for this project. Thus, we need only examine whether the Commissioner applied the law correctly. *See id.*

The Commissioner applied the law correctly in summarily denying RLWD's permit ap-

plication. The Commissioner's order[4] cites Minn.R. 6115.0240, subpt. 2.A. This rule requires permit applicants to describe fully in their application any property rights acquired or to be acquired for the project. Minn.R. 6115.0240, subpt. 2.A (1993); *see also* Minn.Stat. § 103G.301, subd. 1(a)(4) (commissioner sets permit requirements). As discussed above, RLWD cannot, as a matter of law, acquire by condemnation the necessary property rights to construct the Maple Lake Project. Thus, RLWD cannot satisfy the threshold requirement of rule 6115 and cannot obtain a permit to begin work on the Maple Lake Project. Accordingly, we uphold the Commissioner's decision.

## III.

 RLWD concludes with the claim that the Commissioner's denial of its permit application constituted an untimely and impermissible appeal of RLWD's decision to approve the project. We believe this argument fails for two reasons. First, the Commissioner's action did not constitute an appeal. On the contrary, the Commissioner denied a permit. The Commissioner holds direct statutory authority to issue and deny permits. Minn.Stat. § 103G.315, subd. 1. Second, even if we were to characterize the Commissioner's denial as an appeal, an affected landowner possesses a right to appeal a watershed district project at any stage, including the condemnation stage. *See Robertson*, 255 N.W.2d at 238. Thus, the Commissioner committed no error by denying RLWD's permit more than 30 days after RLWD approved the project.

**Affirmed.**

---

4. Omitted from RLWD's appendix in violation of Minn.R.Civ.App.P. 130.01, subd. 1(c), (e).